MICHAEL CHRISTIAN, ISB #4311
PETER J. SMITH IV, ISB # 6997
SMITH + MALEK, PLLC
601 E. Front Avenue, Suite 304
Coeur d'Alene, ID 83814
P.      (208) 215-2411
F.      (208) 215-2416
E:      mike@smithmalek.com
E:      peter@smithmalek.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KT CONTRACTING CO., INC., an Oregon corporation, HIGHWAY SPECIALTIES, LLC, a Washington limited liability company, and KARL THATCHER, an individual, | Case No. _____ |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| DAVID FARB, an individual, and FARB GUIDANCE SYSTEMS, INC., a Delaware corporation, | **JURY TRIAL REQUESTED** |
| Defendants. | |

Plaintiffs KT CONTRACTING CO., INC., HIGHWAY SPECIALTIES, LLC, and

KARL THATCHER allege as follows:

## I.    JURISDICTION AND VENUE

1.      This Court has jurisdiction over Plaintiffs' claim of violations of federal law

pursuant to 28 U.S.C. § 1331.

2.     This Court has jurisdiction over Plaintiffs' state law claims set forth in this Complaint pursuant to 28 U.S.C. § 1367(a).  Both federal and state claims alleged herein arose from a common nucleus of operative facts, the state actions are so related to the federal claims that they form part of the same case or controversy, and the actions would ordinarily be expected to be tried in one judicial proceeding.

3.     Pursuant to 28 U.S.C. § 1391(b)(2), venue is proper in the United States District Court, District of Idaho, Northern Division, in that a substantial part of the acts or omissions giving rise to the claims asserted herein occurred in Kootenai County, Idaho.

## II.     PARTIES

4.     Plaintiff KT CONTRACTING CO., INC. ("KT") is an Oregon corporation authorized to do business in the State of Idaho.

5.     Plaintiff HIGHWAY SPECIALTIES, LLC ("Highway Specialties") is a Washington limited liability company authorized to do business in the State of Idaho.

6.     Plaintiff KARL THATCHER ("Thatcher") is a married man who resides in the State of Oregon.  Thatcher, his spouse, and close family members own 97% of the stock of KT and 90% of the membership interest of Highway Specialities.

7.     Defendant DAVID FARB ("Farb") is an individual residing in Spokane County, Washington.

8.     Defendant FARB GUIDANCE SYSTEMS, INC. ("Farb Guidance") is a Delaware corporation.

## II.     FACTUAL ALLEGATIONS

9.     In August 2016, Thatcher was introduced to Farb in Coeur d'Alene, Idaho.

COMPLAINT: 2

10.     Farb proposed to Thatcher, directly and through his agents, that Thatcher invest several hundred thousand dollars in a for-profit business venture Farb proposed to create involving the deployment of autonomous tractors for farm field cultivation.

11.     The business venture was to be conducted through Precision Farming Group, Inc. ("PFG"), an Idaho corporation created by Farb and his agents.

12.     The Caterpillar tractors and associated hardware and software to be used by PFG were to be purchased from Farb Guidance, a Delaware corporation controlled by Farb.

13.     Farb represented to Thatcher, directly and through his agents, that his investment in PFG would be used to pursue profit through the operation of the autonomous tractors to cultivate farm fields owned by others for fees, and through the operation of a subsidiary trucking business hauling harvested product for others for fees.  Farb repeated these representations to Thatcher through 2017.

14.     In reliance upon Farb's representations, Thatcher invested several hundred thousand dollars in or for the benefit of PFG, including:

a.   Thatcher caused Highway Specialties to purchase four autonomous tractors for PFG's use. The first was purchased from Farb Guidance for $125,000 in March 2017.  Highway Specialties then purchased three additional autonomous tractors from Farb Guidance for a total of $375,000 in June 2017.

b.   On March 6, 2017, Thatcher caused KT to lease a commercial office/retail building in Post Falls, Idaho for use by PFG, Farb Guidance, Farb Farms, LLC, a company wholly owned by Farb ("Farb Farms"), and PFG Trucking, LLC, a wholly owned subsidiary of PFG;

c. Thatcher caused KT to provide a loan guarantee necessary for PFG to purchase two specialized potato trailers for $201,520 on April 27, 2017;

d. In July through September 2017, Thatcher paid an additional $40,000 to PFG;

e. On February 2, 2018, Thatcher made a $25,000 loan to PFG in order to cause it to pay down debt owed to KT;

f. For several months during 2017, Thatcher provided a side-by-side all terrain vehicle for PFG's use in order to map fields;

g. Between February 2018 and July 2018, Thatcher loaned a total of $66,000 to Tyson Arnold and Clinton Arnold as payment for their services because PFG was not paying them for their contracted work for PFG, Farb Guidance, and Farb Farms;

h. As of November 21, 2019, KT paid payroll and other operating expenses of PFG and PFG Trucking of over $330,000; and

i. Thatcher provided for insurance on equipment owned by Precision Farming, Farb Guidance and Farb Farms and provided DOT numbers for the leased trucks for 2017.

15. In total, Thatcher's investments in and loans to PFG totalled over $1,000,000.

16. In exchange for his investments, Thatcher was to receive 20% of the stock of PFG and an annual reimbursement of his loans in the form of additional stock and cash.

17. Throughout 2017 and 2018, as Thatcher continued to make investments in and loans to PFG, directly and through Highway Specialties and KT, Farb repeated his representations that PFG was pursuing a for-profit business and was using Thatcher's

investments and loans for such a business purpose.  Thatcher's ongoing investments and loans were made in reliance upon Farb's representations.

18.     Farb was the chief executive officer of PFG, and made all business decisions for the company unilaterally.

19.     Throughout 2017 and 2018, Farb controlled the accounting books and checking account of PFG.  He did not allow Thatcher access to the books or checking account, despite requests from Thatcher; thus he concealed the accounting books and checkbook from Thatcher, even though Thatcher was designated as PFG's chief financial officer.

20.     During 2017, Thatcher noticed that Farb was causing PFG to pay certain expenses of Farb Farms, including through the use of funds provided by Thatcher.  Farb represented to Thatcher repeatedly that Farb Farms was merely "waiting on some bills to be paid" and would reimburse PFG.

21.     Farb concealed from Thatcher the true extent to which Farb caused PFG to make payments to or for the benefit of Farb Farms.

22.     On or about September 6, 2018, Thatcher met with Farb and asked to view PFG's accounting records regarding the Farb Farms debt to PFG. Farb refused to provide Thatcher access to the records.

23.     The leases for the four autonomous tractors provide that upon failure by PFG to make the required lease payments, Highway Specialties may terminate the leases and recover possession of the autonomous tractors.  True and correct copies of the leases are attached hereto as **Exhibit A**.

COMPLAINT: 5

24.    On or about April 1, 2019, Highway Specialties sent PFG and Farb a letter declaring the leases for all four tractors terminated pursuant to PFG's failure to make the monthly lease payments, and requesting the location of the tractors in order for Highway Specialties to recover possession of them. A true and correct copy of this letter is attached hereto as **Exhibit B.**

25.    Farb personally signed the certified return receipt for the April 1, 2019 letter.  A true and correct copy of the signed certified mail return receipt is attached hereto as **Exhibit C**.

26.    Farb removed the four autonomous tractors from PFG's possession and has refused to turn them over to Thatcher or Highway Specialties. Upon information and belief, Farb caused one of the tractors to be moved to Hawaii, and caused two others to be moved to Wisconsin.

27.    Farb has access to the GPS software installed in each of the four autonomous tractors and can therefore access and disclose the location of the four skid steers, but has refused to do so.

28.    On information and belief, Farb caused or allowed Farb Guidance to take possession and make use of the four autonomous tractors for demonstrations and work across the United States in 2018 and 2019.

29.    As a consequence, the autonomous tractors owned by Highway Specialties have experienced use and wear not contemplated under their leases.

30.    The tractor leases prohibited assignment of the lessee's rights and obligations by PFG without the prior express written consent of Highway Specialties, and it gave no such consent.

COMPLAINT: 6

31.     In September 2018, Thatcher was able to obtain access to PFG's Quickbooks accounting records. He has never been able to recover from Farb the documents that back up the Quickbooks entries.

32.     Through review of the Quickbooks records, Thatcher discovered that, contrary to Farb's representation that PFG was to be run, and to use Thatcher's investments, as a for-profit business venture, Farb was using PFG's funds and services largely for the benefit of Farb Farms, which was controlled by Farb.

33.     Thatcher discovered that between late 2016 and late 2018, Farb caused PFG to pay directly to Farb Farms or to third parties for its benefit approximately $1,000,000 in total. Expenses Farb caused PFG to pay to or for the benefit of Farb Farms included: equipment lease payments, fertilizer, employee payroll, land rental payments, custom farming work done by PFG for Farb Farms, and other Farb Farms expenses.

34.     In addition, Thatcher discovered that Farb caused PFG's wholly-owned subsidiary, PFG Trucking, to provide extensive trucking services to Farb Farms, without charge. This caused PFG to incur expenses for labor, fuel, insurance, and equipment for Farb Farms' benefit without compensation.

35.     In addition, Thatcher discovered that in 2018 Farb began causing PFG Trucking to pay Farb Farms expenses.

36.     Farb both misrepresented these actions to Thatcher and concealed them from him by refusing him access to any company records that would have revealed Farb's conduct.

37.     Upon information and belief, Farb made similar misrepresentations and material omissions to other investors in PFG.

38.     In his control of PFG, Farb Farms and Farb Guidance, Farb avoided engaging in corporate formalities.  For example, he refused to sign the PFG bylaws.  He caused others to make required filings with the Idaho Secretary of State without using his name.  He refused to sign leases and other contracts on behalf of the company, even though he was its chief executive officer.  Farb regularly acted unilaterally and without the involvement or approval of the PFG board of directors.  On information and belief, he also did so with respect to Farb Farms and Farb Guidance. He regularly moved funds between PFG, Farb Guidance and Farb Farms accounts without disclosing this fact to Thatcher and others.

39.     In inducing Thatcher's investments in and loans to PFG, Farb did not provide to Thatcher a prospectus or private placement memorandum.  Upon information and belief, Farb did not provide any such documentation to any other investor in PFG.

40.     In inducing Thatcher's investments in and loans to PFG, Farb did not obtain certification that Thatcher was an accredited investor.  Upon information and belief, Farb did not obtain any such certification from any other investor in PFG.

41.     In inducing Thatcher's and others' investments in and loans to PFG, Farb did not register PFG's stock or make any filing with the United States Securities and Exchange Commission ("SEC") or Idaho Department of Finance identifying any exemption from registration requirements.

42.     In inducing investments in and loans to PFG by Thatcher and others, Farb did not register or become licensed with the Idaho Department of Finance as a broker-dealer.

43.     On August 15, 2016, Farb sold Thatcher 60,000 shares in Farb Guidance, which is evidenced by a stock certificate. On June 6, 2018, Farb sold Thatcher an additional 40,000 shares

in Farb Guidance, which is evidenced by a notation on the original stock certificate and signed by Farb.

44.     On or about December 11, 2017, Farb caused PFG to engage in a stock sale transaction with Jeff Schwers in exchange for payment of $100,000.

45.     On or about December 12, 2017, Farb caused PFG to engage in a stock sale transaction with Jason Schwers in exchange for payment of $50,000.

46.     On or about December 14, 2017, Farb caused PFG to engage in a stock sale to William T. Black in exchange for a payment of $100,000.

47.     Farb did not disclose the stock sales to Jeff Schwers, Jason Schwers or William T. Black to Thatcher (even though he had been designated as PFG's chief financial officer). Thatcher did not discover the stock sales until he was able to obtain control of PFG's Quickbooks accounting records.

48.     During 2017 and 2018 Farb regularly engaged in sales of Farb Guidance stock to others generating proceeds in excess of $800,000.  In inducing these stock sales, Farb did not register or become licensed with the Idaho State Department of Finance as a broker-dealer.

49.     In total, in 2017 and 2018, Farb caused PFG and PFG Trucking to make payments to him personally or for his personal benefit totalling a net amount of at least $171,648.80.  This does not include amounts Farb cause PFG or PFG Trucking to pay to or for the benefit of Farb Farms.

50.     During the same period, in reliance upon Farb's representations, Thatcher and KT Contracting loaned or paid for the benefit of PFG a total of approximately $563,000, and Highway Specialties purchased four autonomous tractors for PFG's use for $500,000.

51.     In his role as CEO and director of PFG, and CEO and director of Farb Guidance, and manager of Farb Farms, Farb employed Tyson Arnold and Clinton Arnold and had the power to influence and control their actions.  Farb actively used this influence or control to cause them to repeat to Thatcher representations that PFG would be run as a for-profit business, in order to induce his investments in and loans to PFG.  Farb was aware of the representations made by Tyson Arnold and Clinton Arnold to Thatcher.

52.     In May 2018, Farb caused Farb Farms to sell a substantial amount of land and equipment.  Shortly after the sales, Farb paid himself approximately $200,000 from Farb Farms' checking account.

## COUNT ONE: FRAUD

53.     Farb's representations to Thatcher as set forth above were representations of fact.

54.     Farb knew the representations to be false, in that he knew he was using Thatcher's, Highway Specialties' and KT's investments in and for the benefit of PFG, directly and through loans and expenditures for the benefit of PFG, for the benefit of Farb Farms (and by extension, himself) rather than for the pursuit of a for-profit business for PFG.

55.     Farb intended that Thatcher, Highway Specialties and KT rely upon his representations in investing, and continuing to invest, in PFG directly and through the loans and expenditures made for PFG's benefit.

56.     Thatcher, Highway Specialties and KT were ignorant of the falsity of Farb's representations, in that they did not know that Farb would and did use the investments made in and for the benefit of PFG for the benefit of Farb Farms (and by extension, himself) rather than the pursuit of a for-profit business for PFG.

57.     Thatcher, Highway Specialties and KT relied upon Farb's representations and were induced by them to make their investments in and for the benefit of PFG, directly and through loans and expenditures made for PFG's benefit.

58.     Thatcher's, Highway Specialties' and KT's reliance was justified, given Farb's position of knowledge, control of PFG's books and accounts, and his position as the chief executive officer in control of PFG.

59.     Thatcher, Highway Specialties and KT were injured as a result of Farb's misrepresentations in a total amount to be proved at trial, but in excess of $1,000,000, for which Farb is liable.

## COUNT TWO: CONVERSION
### Highway Specialties Claim Against Farb

60.     After PFG's default under its leases with Highway Specialties for the autonomous tractors owned by Highway Specialties, Highway Specialties was entitled to retake possession of the tractors.

61.     Farb  and Farb Guidance wrongfully gained dominion of the tractors in a manner inconsistent with Highway Specialties' rights, by refusing to turn over the tractors to Highway Specialties, refusing to disclose their location, and removing and concealing the tractors.

62.     Farb's and Farb Guidance's actions constitute conversion, for which they are liable to Highway Specialties in an amount to be proved at trial.

## COUNT THREE: CLAIM AND DELIVERY -- IDAHO CODE § 8-302

63.     Highway Specialties is the owner of four Caterpillar tractors equipped with hardware and software to enable autonomous operation:

   a.   2016-299DS Caterpillar Multi-Terrain, ID FD201664;

     b.   2016-299DS Caterpillar Multi-Terrain, ID E0008312, S/N FD201672;

     c.   2016-299DS Caterpillar Multi-Terrain, ID E0008311, S/N FD201666;

     d.   2016-299DS Caterpillar Multi-Terrain, ID E0008316, S/N FD201671.

64.     The four tractors have been wrongfully detained by Farb and Farb Guidance.

65.     Farb came into possession of the four tractors by virtue of the lease by Highway Specialties of the tractors to PFG, and Farb's control of PFG and its assets.

66.     Farb and Farb Guidance detained the tractors following the termination of the leases for the tractors after PFG's default under the leases.

67.     The actual value of the tractors is estimated to be $300,000.

68.     To the best knowledge, information, and belief of Highway Specialties, the location of the tractors is as follows:  One tractor may be in Hawaii.  Two tractors may be in Wisconsin.  The location of the fourth tractor is unknown.

69.     Farb's address is:  2512 N. Chase Rd., Liberty Lake, Washington 99019.  Farb Guidance's address is unknown.

70.     The subject four tractors have not been taken for a tax, assessment, or fine, pursuant to a statute; or seized under an execution against the property of any of the Plaintiffs.

71.     Highway Specialties is entitled to immediate possession of the four tractors.

72.     Highway Specialties is entitled to an injunction requiring Farb and Farb Guidance to deliver the four tractors back into Highway Specialties' possession.

**COUNT FOUR:  SECURITIES FRAUD -- IDAHO CODE § 30-14-501**

73.     Farb directly offered and sold Thatcher stock in PFG and Farb Guidance, and solicited loans to PFG from Thatcher, Highway Specialties, and KT.

74.     The loans solicited by Farb are securities.

75.     In connection with the offer and sale of PFG and Farb Guidance stock to Thatcher, and in connection with the solicitation of loans to PFG by Thatcher, Highway Specialities and KT, Farb:

    a.  Employed a device, scheme, or artifice to defraud, specifically, misrepresenting to Thatcher that PFG would be run, and was run, as a for-profit business when in fact it was mostly operated to direct funds to or for the benefit of Farb Farms, and to or for the benefit of Farb personally;

    b.  Made untrue statements of material fact and omitted to state material facts necessary in order to make statements made not misleading, specifically, misrepresenting to Thatcher that PFG would be run, and was run, as a for-profit business when in fact it was mostly operated to direct funds to or for the benefit of Farb Farms, and to or for the benefit of Farb personally, and omitting to state the extent to which PFG funds would be and were directed to or for the benefit of Farb Farms and Farb personally;

    c.  Engaged in acts, practices or a course of business that operated as a fraud or deceit upon another person, specifically, inducing Thatcher, Highway Specialities and KT to invest in and loan funds to PFG based on the foregoing misrepresentations and omissions; and

    d.  Diverted funds provided by Thatcher, Highway Specialties and KT to his personal use, directly or indirectly through Farb Farms or Farb Guidance.

76.     Farb failed to inform Thatcher of his failure to register the PFG securities and himself as a broker-dealer.

77.     Farb intended that Thatcher, Highway Specialties and KT rely upon his misrepresentations and fraudulent omissions by continuing to provide funds to PFG through direct investments and loans.

78.     Thatcher, Highway Specialties and KT relied upon Farb's misrepresentations and fraudulent omissions, as they would not have made the investments in and loans to PFG had they known the truth of Farb's actions.

79.     Farb's actions constitute violations of  Idaho Code § 30-14-501, for which he is liable to Thatcher, Highway Specialties, and KT for actual damages or rescission in a total amount to be proved at trial, but in excess of $1,000,000.

### COUNT FIVE:  SECURITIES FRAUD -- SECURITIES EXCHANGE ACT OF 1934 § 10(b) AND SEC RULE 10(b)(5)

80.     Farbs misrepresentations and omissions to Thatcher, Highway Specialties and KT as set forth herein constitute materially false and misleading statements.

81.     Farb's statements and omissions to Thatcher, Highway Specialties and KT are false and misleading because Farb intended to, and did, use the investments and loans from Thatcher, Highway Specialties and KT for Farb Farms' and his benefit, rather than operating PFG as a for-profit business as represented.

82.     Farb made the statements and omissions with knowledge of their falsity and misleading nature, and made them intentionally or with deliberate recklessness.

83.     Thatcher, Highway Specialties and KT relied upon Farb's misrepresentations and fraudulent omissions, as they would not have made the investments in and loans to PFG had they known the truth of Farb's actions.

84.     Farb had the motive and opportunity to commit fraud against Thatcher, Highway Specialties and KT by maintaining complete control over the business decisions, actions and books of PFG, Farb Guidance and Farb Farms, and by concealing the books and actions from Thatcher, Highway Specialties and KT.

85.     Farb's actions constitute violations of § 10(b) of the Securities Exchange Act of 1984 and SEC Rule 10b-5, for which Farb is liable to Thatcher, Highway Specialties, and KT for actual damages caused by Farb's misrepresentations and fraudulent omissions, in a total amount to be proved at trial, but in excess of $1,000,000.

**COUNT SIX: CONTROL PERSON LIABILITY -- IDAHO CODE § 30-14-509(g)(2)**

86.     Farb, in his capacity as the chief executive officer and director of PFG, Farb Guidance and Farb Farms, employed Tyson Arnold and Clinton Arnold.

87.     Farb directed Clinton Arnold and Tyson Arnold to solicit investments and loans for PFG  when he was not registered as a broker-dealer and PFG securities were not registered.

88.     When they solicited investments and loans from Thatcher, Highway Specialties and KT, Clinton Arnold and Tyson Arnold were not registered as broker-dealers.

89.     Farb is liable to Thatcher, Highway Specialties and KT for the actions of Clinton Arnold and Tyson Arnold pursuant to Idaho Code § 30-14-509(g), in a total amount to be proved at trial but in excess of $1,000,000.

**COUNT SEVEN: CONTROL PERSON LIABILITY -- SECURITIES EXCHANGE ACT OF 1934 § 20(a)**

90.     The misrepresentations and omissions of Clinton Arnold and Tyson Arnold to Thatcher, Highway Specialties and KT directed by Farb as alleged herein, constitute violations of § 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5.

91.     Because he was making the same misrepresentations and omissions with knowledge of their falsity, as alleged herein, Farb was aware of the falsity of the misrepresentations and omissions being made by Clinton Arnold and Tyson Arnold.

92.     By virtue of his position, Farb had the power to influence or control Clinton Arnold and Tyson Arnold, and actively used this influence or control so as to be a culpable participant in their acts.

93.     Farb is liable to Thatcher, Highway Specialties and KT for the actions of Clinton Arnold and Tyson Arnold as a controlling person pursuant to §20(a) of the Securities and Exchange Act of 1934, in a total amount to be proved at trial, but in excess of $1,000,000.

**COUNT EIGHT:  FAILURE TO REGISTER AS BROKER -- IDAHO CODE § 30-14-509(d)**

94.     Farb is a broker-dealer pursuant to Idaho Code § 30-14-102(4) because he was engaged in the business of effecting transactions in securities for the account of others, namely PFG and Farb Guidance.

95.     Farb never registered as a broker-dealer before he transacted business in Idaho and his actions are not exempt from registration.

96.     Farb is liable to Thatcher, Highway Specialties, and KT as purchasers pursuant to Idaho Code § 30-14-509(d) in a total amount to be proved at trial, but in excess of $1,000,000.

**COUNT NINE: FAILURE TO REGISTER AS A BROKER -- SECURITIES EXCHANGE ACT OF 1934 § 15(a)**

97.     Farb is a broker under the Securities Exchange Act of 1934 because he engaged in the business of effecting transactions in securities for others, namely, PFG and Farb Guidance.

98.      Farb did not register as a broker of securities as required pursuant to § 15(b) of the Securities and Exchange Act of 1934.

99.     Farb did not notify Thatcher, Highway Specialties, or KT that he was not registered to sell securities as required by law.

100.    Farb is liable to Thatcher, Highway Specialties, and KT pursuant to § 15(a) of the Securities and Exchange Act of 1934 in a total amount to be proven at trial, in excess of $1,000,000.

**COUNT TEN:  FAILURE TO REGISTER SECURITIES -- IDAHO CODE § 30-14-301**

101.    Farb offered and sold unregistered securities in 2017 and 2018 to Thatcher, Highway Specialties, and KT through stock sales and soliciting investments and loans for PFG.

102.    Farb offered and sold PFG securities in Idaho without registering said securities, and is not exempt from registration.

103.    Farb is liable pursuant to Idaho Code § 30-14-509(b) to Thatcher, Highway Specialties, and KT as purchasers as a result of the sale to them of unregistered securities, in a total amount to be proved at trial but in excess of $1,000,000.

**COUNT ELEVEN: FAILURE TO REGISTER SECURITIES -- SECURITIES ACT OF 1933  § 12**

104.    Farb did not register PFG securities prior to soliciting investments and otherwise facilitating the sale of PFG stock.

105.     Farb offered and sold unregistered securities in 2017 and 2018 to Thatcher, Highway Specialties, and KT through stock sales and soliciting investments for PFG.

106.     PFG stock is not exempt from registration.

107.     Even should Farb establish that his securities are exempt from registration, he failed to determine whether Thatcher, Highway Specialties, or KT were accredited investors.

108.     Based upon Farb's failure to register PFG securities prior to their sale, pursuant to § 12(a)(1) of the Securities Act of 1933 Farb is liable to Thatcher, Highway Specialties, and KT for actual damages and rescission, plus interest, in a total amount to be proved at trial, but in excess of $1,000,000.

**COUNT TWELVE: INSPECTION OF CORPORATE RECORDS -- IDAHO CODE §§ 30-29-1602 & 30-29-1605**

109.      Thatcher is entitled to inspection rights as a Director and shareholder of PFG.

110.     Thatcher formally demanded to inspect and copy PFG's corporate records by certified mail to Farb and received no response from Farb.

111.     Farb has personal possession and control of PFG's records and has refused to allow Thatcher access by failing to respond to the inspection request.

112.     Pursuant to Idaho Code §§  30-29-1602 and 30-29-1605, Thatcher is entitled to inspect and copy PFG's corporate records in order to fulfill his duties as director and his right as shareholder to ensure that corporate funds are spent appropriately.

**III.   PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.     Judgment against Farb in favor of Thatcher an amount to be proved at trial;

B.      Judgment against Farb in favor of Highway Specialties in an amount to be proved at trial;

C.      Judgment against Farb in favor of KT Specialities in an amount to be proved at trial;

D.      Judgment against Farb and/or Farb Guidance in favor of Highway Specialties in the form of an injunction requiring Farb to return the four autonomous tractors to Highway Specialties;

E.      Judgment against Farb and in favor of Thatcher requiring Farb release and disclose PFG's records for Thatcher to inspect and copy;

F.      An award of prejudgment interest in favor of each of the Plaintiffs with respect to their monetary claims against Farb, at the maximum legal rate;

G.      An award of reasonable attorney fees and costs incurred herein, including but not limited to Idaho Code § 12-120(3); and

H.      Such other and further relief as the Court deems just and equitable.

DATED this 30th day of March, 2020.

                                SMITH + MALEK, PLLC


                                _____
                                MICHAEL CHRISTIAN, ISB #4311
                                Attorney for Plaintiffs

# EQUIPMENT LEASE – WITH PURCHASE OPTION

This Equipment Lease – Purchase Option (the "Agreement") is effective [DATE],

*8311*

**BETWEEN:**  **Precision Farming Group, inc.** (the "Lessee"), a company organized and existing under the laws of the State of Idaho, with its head office located at:

3760 E Seltice Way, Post Falls, Idaho, 83854, United States

**AND:**  **HIGHWAY SPECIALTIES** (the "Lessor"), a company organized and existing under the laws of the State of Oregon, with its head office located at:

PO Box 9180, Salem OR 97305

WITNESSETH:

WHEREAS the Lessor wishes to enter into an operating lease with the Lessee for the equipment hereinafter described;

WHEREAS the Lessee wishes to lease such equipment from the Lessor on the basis of the operating lease terms and conditions hereinafter set forth;

NOW THEREFORE, the parties hereby agree as follows:

## 1.    LEASE AGREEMENT

1.1    Lessor hereby leases to Lessee, and Lessee hereby rents from Lessor all the machinery, equipment and other personal and movable property (hereinafter collectively called the "Equipment" and individually an "item" of Equipment) described in Schedule "A" hereto or in such replacement equipment lease schedules which may from time to time hereafter be executed by Lessor and Lessee and attached hereto or incorporated herein by reference, upon the terms and conditions set forth in this Lease, as supplemented by the terms and conditions set forth in the appropriate schedule identifying such items of Equipment.

1.2    All of the terms and conditions of this Lease shall govern the rights and obligations of Lessor and Lessee except as specifically modified in writing. Whenever reference is made herein to "this Lease", it shall be deemed to include each of the various schedules identifying all items of Equipment and any additional terms applying to any item of Equipment, all of which constitute one undivided lease of the Equipment on the terms and conditions incorporated herein by reference.

## 2.    TERM

2.1    The obligations under this Lease in respect of the Equipment shall commence as of and from July 1st 2017, and shall continue for 60 months inclusively (provided Lessee is not in default hereunder at such time) and unless terminated prior thereto pursuant to the provisions hereof and unless modified by any schedule.

**3.    RENTAL PAYMENTS**

3.1    Lessee shall pay to Lessor as rent for the Equipment monthly rent payments during the term of this Lease in the amount of Three Thousand Three Hundred Forty Two Dollars ($3,342.59) each month.

3.2    The first rental payment shall be due and payable on August 20th, 2017, and the subsequent monthly rental payments shall be due on the 20th day of each month thereafter during the term hereof, each at the office of the Lessor, PO Box 9180, Salem Oregon, 97305, United States, or at the offices of its assigns (or at such other place as Lessor from time to time designates in writing). The receipt of any check or other item on account of any rental payment will not be considered as payment thereof unless such check or other item is honored when presented for payment.

**4.    TERMS AND CONDITIONS OF LEASE**

4.1    The terms and conditions of this Lease annexed hereto as Schedule "B" are incorporated herein by reference as if fully set forth herein and shall be deemed to form an integral part of this Lease.

**5.    GENERAL TERMS**

5.1    This Lease shall be interpreted and construed in accordance with the laws of the State of Oregon and treated in all respects as an Oregon contract.

5.2    All amounts expressed herein and in the various Schedules hereto are in legal tender of United States (United States $), unless expressly provided otherwise.

5.3    This Lease shall enure to the benefit of and be binding upon Lessor and Lessee and their respective successors and permitted assigns.

5.4    This Lease and the rights and obligations hereunder may not be assigned by Lessee without the prior express written consent of Lessor. Lessor may assign this Lease and its rights and obligations hereunder at any time in whole or in part.

5.5    Lessee acknowledges that all additional security now or hereafter held by Lessor as security for any debts or obligations of Lessee to Lessor shall secure the obligations of Lessee to Lessor under this Lease.

5.6    Lessee hereby acknowledges receipt of an executed copy of this Lease.


IN WITNESS WHEREOF, each party to this agreement has caused it to be executed at [PLACE OF EXECUTION] on the date indicated above.


**LESSOR**                                          **LESSEE**


_____                    _____
Authorized Signature                              Authorized Signature

_KARL THATCHER MEMBER_          _Clinton Arnold General Manager_
Print Name and Title                              Print Name and Title

_____

Equipment Lease – Purchase Option                                   Page 2 of 9

**<u>EQUIPMENT DESCRIPTION</u>**

Schedule A

2016-299DS Caterpillar Multi-Terrain
SMU: 24hrs ID:E0008311
Caterpillar Remote
Farb Guidance Software
Navigation Equipment

**SCHEDULE B**
**TERMS AND CONDITIONS OF LEASE**

1.  Warranty Limits and Disclaimer

    The terms and conditions set out in the Purchase and Security Agreement between Precision Farming Group, inc. and Lessee dated [DATE] regarding warranty limits and disclaimers with respect to the items of Equipment respectively dealt with therein are incorporated herein by reference as if herein set forth at length. Without limiting the generality of the foregoing, LESSOR HEREBY DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES AND CONDITIONS (INCLUDING BUT NOT LIMITED TO WARRANTIES AND CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND ANY AGREEMENTS, REPRESENTATIONS, AFFIRMATIONS OR WARRANTIES, WHETHER ORAL OR WRITTEN, MADE BY ANY AGENT, EMPLOYEE OR REPRESENTATIVE OF LESSOR, UNLESS SPECIFICALLY SET FORTH IN THIS PARAGRAPH OR SPECIFICALLY INCORPORATED HEREIN BY REFERENCE.

    LESSOR'S LIABILITY FOR ANY DEFECT IN MATERIAL OR WORKMANSHIP OF THE EQUIPMENT IS LIMITED TO THE WARRANTY SET FORTH IN THIS PARAGRAPH AND LESSOR SHALL NOT BE LIABLE FOR BREACH OF CONTRACT ARISING FROM ANY DEFECT IN MATERIAL OR WORKMANSHIP OF THE EQUIPMENT. IN NO EVENT SHALL LESSOR BE LIABLE FOR LOSSES BASED UPON DOWNTIME, OVERHEAD, LOST LABOUR, DAMAGES TO MACHINERY, SPOILAGE, LOST PRODUCTION OR PROFITS OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS TRANSACTION. LESSOR SHALL NOT BE LIABLE FOR ANY OTHER FAILURES OR DEFECTS. Except as expressly provided above, Lessee agrees that Lessor has not given any express or implied representation or warranty as to the design, merchantability, suitability, durability or condition of the Equipment and the doctrine of fundamental breach shall have no application to this Lease.

2.  Equipment Owned by Lessor

    This Lease is one of leasing only and Lessee shall not have or acquire any right, title or interest in or to the Equipment, which shall remain with Lessor, except the right of Lessee and its competent employees to use or operate the Equipment as provided herein. Lessee hereby expressly waives any rights, benefits or protection given to it by the laws, present or future, of any jurisdiction, in favor of conditional sales lessees or bailees.

3.  Loss or Damage to Equipment

    Lessee assumes the entire risk of loss of or damage to the Equipment from any cause whatsoever. No loss or damage to the Equipment or any part thereof shall affect or impair the obligations of Lessee hereunder which shall continue in full force and effect.

4.  No Sublease or Assignment of Lease by Lessee

    Lessee shall not transfer, deliver up possession of, or sublet the Equipment and this Lease and the rights and obligations thereunder shall not be assignable by Lessee without the written consent of the Lessor, which consent may not be unreasonably withheld. Lessor may at any time, whether with or without notice to Lessee, assign, pledge, mortgage, transfer or otherwise dispose of, either in whole or in part, its rights hereunder.

5.  Maintenance and Inspection of Equipment

    Lessee shall at all times and at Lessee's own expense keep the Equipment in good and efficient

working order and repair and shall furnish any and all parts, mechanisms and devices required to keep the Equipment in good mechanical and working order. Lessor, its employees and/or agents shall at all times have access to the Equipment for the purpose of inspecting it. Lessee shall not, without the prior written consent of the Lessor, make any alterations, additions or improvements to the Equipment. All such alterations or improvements so made shall belong to and remain the property of Lessor.

6.   Compliance by Lessee With All laws, Ordinances, Etc.

Lessee shall comply with and conform to all laws, ordinances and regulations, present or future, in any way relating to the ownership, possession, use or maintenance of the Equipment throughout the term of this Lease and to the full and complete exoneration from liability of Lessor. Lessor shall not be liable for any special or consequential damages as a result of any act or omission of Lessor under this Lease.

7.   Equipment to be Kept Free of Levies, Privileges, Liens, Charges, Etc.

Lessee shall keep the Equipment free of levies, privileges, liens and encumbrances and shall pay all license fees, registration fees, assessments, charges and taxes (municipal, state/provincial and federal) which may be levied or assessed, directly or indirectly, against or on account of the Equipment or any interest thereon or use thereof. This Lease is a net lease and every cost or expense existing or arising with respect to the Equipment or Lessee's lease, possession or use thereof and all Taxes shall be borne by the Lessee. If Lessee shall fail to pay such license fees, registration fees, assessments, charges or Taxes, Lessor may pay the same, in which event the cost thereof shall be forthwith due and payable by Lessee.

8.   Indemnification of Lessor by Lessee

Lessee hereby indemnifies Lessor against and holds Lessor harmless from any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including legal fees, arising out of or connected with or resulting from the Equipment, including, without limitation, the manufacture, selection, delivery, installation, possession, use, operation or return of the Equipment or otherwise on account of any personal injury or death or damage to property occasioned by the Equipment or the negligence of the employees, servants or agents of Lessee or Lessor, or on account of any infringement or alleged infringement of any patent of any third party, resulting from or relating to the Lessee's operation of the Equipment or the product of such operation.

9.   Insurance

Lessee shall, at its sole expense, place and maintain as and from the date hereof, in a form and with coverage and limits acceptable to Lessor: (a)  "all risks" insurance against the loss or theft of or damage to the Equipment for the full replacement value thereof naming Lessor as loss payee, and (b) public liability and property damage insurance naming Lessor as additional insured, covering any liability in respect of the use, operation, possession or ownership of the Equipment. Such insurance policy shall contain a provision prohibiting termination of the policy except upon thirty days' notice by the insurer to Lessor. However, any insurance coverage required hereunder by Lessee shall in no manner restrict or limit the liabilities assumed by Lessee hereunder. Lessee shall furnish to Lessor certified copies or certificates of the said insurance policies. Any insurance proceeds for damage to or destruction of the Equipment shall be paid to Lessor and applied towards satisfaction of Lessee's payment obligations hereunder. In any event, Lessee shall assume the entire risk of, and shall indemnify Lessor for, any loss of or damage to the Equipment.

10.   Equipment to Remain Personal Property

The Equipment shall at all times during the term of this Lease be and remain personal or movable

property, regardless of the manner in which it may be attached to any real estate. Lessee shall install the Equipment in a manner which will permit its removal without material injury to the place of installation. Lessee shall be responsible for any damages done to any real or movable property, building or structure by the removal of the Equipment and shall indemnify and save Lessor harmless therefrom.

11.     Remedies on Default

Upon the happening of any event of default hereunder, Lessor shall be entitled at any time thereafter to do any one or more of the following without prejudice to any other right it may have against Lessee:

(a)     make such payments or take such steps as may be necessary to remedy the default and, upon demand, recover such payments and Lessor's costs incurred from Lessee together with any other sums then due and payable under this Lease;

(b)     terminate this Lease and take possession of the Equipment without demand or notice wherever it may be located and sell, lease or otherwise dispose of the Equipment upon such terms and conditions as Lessor may deem fit;

(c)     recover, as damages for the loss of the bargain and not as a penalty and in lieu of any further claim for periodic rent accruing from and after the date of such termination, a sum, with respect to the Equipment, which represents the excess of the present worth, at the date of such termination, of all rents for the Equipment which would otherwise have accrued hereunder from the date of such termination to the end of the term of this Lease over the then present worth of the then fair market value of the Equipment for such period computed by discounting from the end of such term to the date of such termination rentals which the Lessor reasonably estimates to be obtainable for the use of the Equipment during such period, such present worth to be computed in each case on a basis of a [PERCENTAGE %] per annum discount, compounded from the respective dates on which the rents would have been payable hereunder had this Lease not been terminated;

(d)     recover any damages and expenses which the Lessor shall have sustained by reason of the Lessee's breach of this lease, including but not limited to reasonable sum fees of legal counsel and such expenses as shall be expended or incurred in the seizure, dismantling, rigging, transportation, storage, reassembly, refurbishing, rental or sale of the Equipment;

(e)     upon notice to Lessee, or the agent of Lessee and without terminating the Lease and with or without taking possession of the Equipment, lease the Equipment to any other party for such rental payments and for such period as Lessor may deem fit and receive such rental payments and apply them against any monies payable or to become payable by Lessee under this Lease;

(f)     exercise any other right it may have by law or equity against Lessee.

12.     Events of Default

Any of the following shall each constitute an event of default:

(a)     the failure of Lessee to pay any installment of the rental payment or any other sum due under the terms of this Lease;

(b)     the breach of any covenant or condition contained in this Lease;

(c)     the termination, liquidation, sale or cessation of the Lessee's business;

(d)     the subjection of the Equipment to any lien, levy, privilege, hypothec or other secured right or any seizure or attachment;

(e)     any assignment by Lessee for the benefit of its creditors;

(f)     the admission of Lessee in writing of its inability to pay its debts generally as they become due;

(g)     the appointment of a receiver, trustee or similar official for Lessee or for any of its property;

(h)     the filing by or against Lessee of a petition in bankruptcy or petition for the reorganization or liquidation of Lessee under any federal or provincial [YOUR COUNTRY LAW];

(i)     any other act of bankruptcy by Lessee.

13.     Assignment by Lessor

Should Lessor assign the sums due and to become due hereunder to any bank, insurance company or any other person, firm or corporation (of which assignment Lessee hereby waives any notice requirement), Lessee shall recognize such assignment and should Lessor default in the performance of any of the terms and conditions of this Lease, Lessee may not, as to such assignee, terminate this Lease or subject Lessee's obligations to pay money under this Lease to any diminution or right of set-off or compensation. Nothing herein contained shall release Lessor from its obligation to perform any duty, covenant or condition required to be performed by Lessor under the terms of this Lease should the same be sold or assigned.

14.     Return of Equipment Upon Termination

Upon the termination of this Lease for any reason, Lessee shall at its cost, return the Equipment to Lessor at a place designated by Lessor and if Lessee fails to do so, Lessor shall have the right to peaceably enter upon the premises where the Equipment may be and take possession of and remove it at Lessee's expense, all without legal process. In the event that, with or without the consent of Lessor, Lessee remains in the possession of or uses the Equipment after the expiration of the term of this Lease, all of the provisions of this Lease shall apply thereto unless and until the same has been surrendered pursuant to the terms of this clause or Lessor has relieved Lessee from its obligations under this Lease with respect to Equipment. Nothing in this clause shall have the effect of extending or renewing the term of this Lease.

15.     Waiver by Lessor

No covenant or condition of this Lease shall be waived except by the written consent of Lessor, and forbearance and indulgence by Lessor in any regard whatsoever shall not constitute a waiver of the covenant or condition to be performed by Lessee to which the same may apply, and, until complete performance by Lessee of said covenant or condition, Lessor shall be entitled to invoke any remedy available to Lessor under this Lease or by law despite said forbearance or indulgence.

16.     Interest Charges

Should Lessee fail to pay when due any rental payment or any sum required to be paid to Lessor, Lessee shall pay interest on such delinquent payment from the date thereof until paid at the rate of 18% per annum.

17.   Time of Essence

Time is of the essence of this Lease in each and all of its provisions.

18.   Interpretation

It is hereby agreed by and between the parties hereto that wherever the context of this Lease so requires, the singular number shall include the plural and vice versa and that words importing the masculine gender shall include the feminine and neuter genders and that in case more than one lessee is named as "Lessee", the liability of such lessees hereunder shall be joint and several.

19.   Conflict With Applicable Law

Any provision of this Lease prohibited by the applicable [YOUR COUNTRY LAW] of any province or territory shall as to such province or territory be ineffective to the extent of the prohibition without invalidating the remaining provisions of this Lease.

20.   Lessee's Obligations Unconditional

Lessee shall pay or perform its obligations under this Lease unconditionally and without regard to any set-off, counterclaim or equities between Lessee and Lessor.

21.   Remedies Cumulative

All rights and remedies herein provided are cumulative and not exclusive to any other rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise of any other right or remedy.

22.   Entire Agreement

This Lease constitutes the entire agreement between the parties with respect to the Equipment and its rental to and use by the Lessee and supersedes all prior agreements, negotiations, discussions and understandings, written or oral, between the parties, save and except the Purchase and Security Agreement entered into between the parties. There are no other terms, conditions, obligations, representations or warranties on the part of either party, whether oral, written, express, implied, statutory or otherwise, governing or affecting the transactions contemplated in this Lease or which may give rights to the Lessee or restrict the rights and remedies of the Lessor.

## PURCHASE OPTION



1.  This Purchase Option is hereby incorporated by reference and relates to the lease (the "Lease") between the parties hereto as identified below.

2.  Lessee has the following options (respectively, the "Early Option" and the "Option") to purchase all, but not less than all, of the Equipment described in the Lease Agreement, on an as-is where-is basis:

    2.1  in the case of the Early Option, at any time after the due date of the first (1st) monthly payment and prior to the due date of the sixtieth (60th) monthly payment (the "Early Option Period") in respect of the Equipment, for a purchase price equal to the principal balance remaining based on the amortization schedule;

    2.2  in the case of the Option, on August 20th, 2022 (the "Option Date") in respect of the Equipment for a purchase price of one dollar, ($1.00)

3.  The Early Option or the Option may be exercised only if Lessee is not in default under the Lease both at the time of exercise and throughout the Early Option Period or at the Option Date (as the case may be).

4.  All terms used herein shall have the meanings set forth in the Lease and the other terms and conditions of the Lease shall apply hereto, mutatis mutandis.

5.  This purchase option shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. This purchase option is not assignable by Lessee without the prior written consent of Lessor.

IN WITNESS WHEREOF, each party to this agreement has caused it to be executed at 3760 E Seltice Way, POST FALLS, IDAHO on the date indicated above.

**LESSOR**

_____
Authorized Signature

_____
KARL THATCHER
Print Name and Title

**LESSEE**

_____
Authorized Signature

_____
Clinton Arnold (General Manager)
Print Name and Title

---

Equipment Lease – Purchase Option

Page 9 of 9

# EQUIPMENT LEASE – WITH PURCHASE OPTION     *83l2*

This Equipment Lease – Purchase Option (the "Agreement") is effective [DATE],

| | |
|---|---|
| **BETWEEN:** | **Precision Farming Group, inc.** (the "Lessee"), a company organized and existing under the laws of the State of Idaho, with its head office located at: |
| | 3760 E Seltice Way, Post Falls, Idaho, 83854, United States |
| **AND:** | **HIGHWAY SPECIALTIES** (the "Lessor"), a company organized and existing under the laws of the State of Oregon, with its head office located at: |
| | PO Box 9180, Salem OR 97305 |

WITNESSETH:

WHEREAS the Lessor wishes to enter into an operating lease with the Lessee for the equipment hereinafter described;

WHEREAS the Lessee wishes to lease such equipment from the Lessor on the basis of the operating lease terms and conditions hereinafter set forth;

NOW THEREFORE, the parties hereby agree as follows:

## 1.     LEASE AGREEMENT

1.1     Lessor hereby leases to Lessee, and Lessee hereby rents from Lessor all the machinery, equipment and other personal and movable property (hereinafter collectively called the "Equipment" and individually an "item" of Equipment) described in Schedule "A" hereto or in such replacement equipment lease schedules which may from time to time hereafter be executed by Lessor and Lessee and attached hereto or incorporated herein by reference, upon the terms and conditions set forth in this Lease, as supplemented by the terms and conditions set forth in the appropriate schedule identifying such items of Equipment.

1.2     All of the terms and conditions of this Lease shall govern the rights and obligations of Lessor and Lessee except as specifically modified in writing. Whenever reference is made herein to "this Lease", it shall be deemed to include each of the various schedules identifying all items of Equipment and any additional terms applying to any item of Equipment, all of which constitute one undivided lease of the Equipment on the terms and conditions incorporated herein by reference.

## 2.     TERM

2.1     The obligations under this Lease in respect of the Equipment shall commence as of and from July 1st 2017, and shall continue for 60 months inclusively (provided Lessee is not in default hereunder at such time) and unless terminated prior thereto pursuant to the provisions hereof and unless modified by any schedule.

**3.      RENTAL PAYMENTS**

3.1      Lessee shall pay to Lessor as rent for the Equipment monthly rent payments during the term of this Lease in the amount of Three Thousand Three Hundred Forty Two Dollars ($3,342.59) each month.

3.2      The first rental payment shall be due and payable on August 20th, 2017, and the subsequent monthly rental payments shall be due on the 20th day of each month thereafter during the term hereof, each at the office of the Lessor, PO Box 9180, Salem Oregon, 97305, United States, or at the offices of its assigns (or at such other place as Lessor from time to time designates in writing). The receipt of any check or other item on account of any rental payment will not be considered as payment thereof unless such check or other item is honored when presented for payment.

**4.      TERMS AND CONDITIONS OF LEASE**

4.1      The terms and conditions of this Lease annexed hereto as Schedule "B" are incorporated herein by reference as if fully set forth herein and shall be deemed to form an integral part of this Lease.

**5.      GENERAL TERMS**

5.1      This Lease shall be interpreted and construed in accordance with the laws of the State of Oregon and treated in all respects as an Oregon contract.

5.2      All amounts expressed herein and in the various Schedules hereto are in legal tender of United States (United States $), unless expressly provided otherwise.

5.3      This Lease shall enure to the benefit of and be binding upon Lessor and Lessee and their respective successors and permitted assigns.

5.4      This Lease and the rights and obligations hereunder may not be assigned by Lessee without the prior express written consent of Lessor. Lessor may assign this Lease and its rights and obligations hereunder at any time in whole or in part.

5.5      Lessee acknowledges that all additional security now or hereafter held by Lessor as security for any debts or obligations of Lessee to Lessor shall secure the obligations of Lessee to Lessor under this Lease.

5.6      Lessee hereby acknowledges receipt of an executed copy of this Lease.


IN WITNESS WHEREOF, each party to this agreement has caused it to be executed at [PLACE OF EXECUTION] on the date indicated above.


**LESSOR**                                                    **LESSEE**


_____              _____
Authorized Signature                                  Authorized Signature

_____              _____
Print Name and Title                                   Print Name and Title

**<u>EQUIPMENT DESCRIPTION</u>**

Schedule A

2016-299DS Caterpillar Multi-Terrain
SMU: 24hrs ID:E0008312
Caterpillar Remote
Farb Guidance Software
Navigation Equipment

**SCHEDULE B**
**TERMS AND CONDITIONS OF LEASE**

1.   Warranty Limits and Disclaimer

The terms and conditions set out in the Purchase and Security Agreement between Precision Farming Group, inc. and Lessee dated [DATE] regarding warranty limits and disclaimers with respect to the items of Equipment respectively dealt with therein are incorporated herein by reference as if herein set forth at length. Without limiting the generality of the foregoing, LESSOR HEREBY DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES AND CONDITIONS (INCLUDING BUT NOT LIMITED TO WARRANTIES AND CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND ANY AGREEMENTS, REPRESENTATIONS, AFFIRMATIONS OR WARRANTIES, WHETHER ORAL OR WRITTEN, MADE BY ANY AGENT, EMPLOYEE OR REPRESENTATIVE OF LESSOR, UNLESS SPECIFICALLY SET FORTH IN THIS PARAGRAPH OR SPECIFICALLY INCORPORATED HEREIN BY REFERENCE.

LESSOR'S LIABILITY FOR ANY DEFECT IN MATERIAL OR WORKMANSHIP OF THE EQUIPMENT IS LIMITED TO THE WARRANTY SET FORTH IN THIS PARAGRAPH AND LESSOR SHALL NOT BE LIABLE FOR BREACH OF CONTRACT ARISING FROM ANY DEFECT IN MATERIAL OR WORKMANSHIP OF THE EQUIPMENT. IN NO EVENT SHALL LESSOR BE LIABLE FOR LOSSES BASED UPON DOWNTIME, OVERHEAD, LOST LABOUR, DAMAGES TO MACHINERY, SPOILAGE, LOST PRODUCTION OR PROFITS OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS TRANSACTION. LESSOR SHALL NOT BE LIABLE FOR ANY OTHER FAILURES OR DEFECTS. Except as expressly provided above, Lessee agrees that Lessor has not given any express or implied representation or warranty as to the design, merchantability, suitability, durability or condition of the Equipment and the doctrine of fundamental breach shall have no application to this Lease.

2.   Equipment Owned by Lessor

This Lease is one of leasing only and Lessee shall not have or acquire any right, title or interest in or to the Equipment, which shall remain with Lessor, except the right of Lessee and its competent employees to use or operate the Equipment as provided herein. Lessee hereby expressly waives any rights, benefits or protection given to it by the laws, present or future, of any jurisdiction, in favor of conditional sales lessees or bailees.

3.   Loss or Damage to Equipment

Lessee assumes the entire risk of loss of or damage to the Equipment from any cause whatsoever. No loss or damage to the Equipment or any part thereof shall affect or impair the obligations of Lessee hereunder which shall continue in full force and effect.

4.   No Sublease or Assignment of Lease by Lessee

Lessee shall not transfer, deliver up possession of, or sublet the Equipment and this Lease and the rights and obligations thereunder shall not be assignable by Lessee without the written consent of the Lessor, which consent may not be unreasonably withheld. Lessor may at any time, whether with or without notice to Lessee, assign, pledge, mortgage, transfer or otherwise dispose of, either in whole or in part, its rights hereunder.

5.   Maintenance and Inspection of Equipment

Lessee shall at all times and at Lessee's own expense keep the Equipment in good and efficient

---

working order and repair and shall furnish any and all parts, mechanisms and devices required to keep the Equipment in good mechanical and working order. Lessor, its employees and/or agents shall at all times have access to the Equipment for the purpose of inspecting it. Lessee shall not, without the prior written consent of the Lessor, make any alterations, additions or improvements to the Equipment. All such alterations or improvements so made shall belong to and remain the property of Lessor.

6.      Compliance by Lessee With All laws, Ordinances, Etc.

Lessee shall comply with and conform to all laws, ordinances and regulations, present or future, in any way relating to the ownership, possession, use or maintenance of the Equipment throughout the term of this Lease and to the full and complete exoneration from liability of Lessor. Lessor shall not be liable for any special or consequential damages as a result of any act or omission of Lessor under this Lease.

7.      Equipment to be Kept Free of Levies, Privileges, Liens, Charges, Etc.

Lessee shall keep the Equipment free of levies, privileges, liens and encumbrances and shall pay all license fees, registration fees, assessments, charges and taxes (municipal, state/provincial and federal) which may be levied or assessed, directly or indirectly, against or on account of the Equipment or any interest thereon or use thereof. This Lease is a net lease and every cost or expense existing or arising with respect to the Equipment or Lessee's lease, possession or use thereof and all Taxes shall be borne by the Lessee. If Lessee shall fail to pay such license fees, registration fees, assessments, charges or Taxes, Lessor may pay the same, in which event the cost thereof shall be forthwith due and payable by Lessee.

8.      Indemnification of Lessor by Lessee

Lessee hereby indemnifies Lessor against and holds Lessor harmless from any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including legal fees, arising out of or connected with or resulting from the Equipment, including, without limitation, the manufacture, selection, delivery, installation, possession, use, operation or return of the Equipment or otherwise on account of any personal injury or death or damage to property occasioned by the Equipment or the negligence of the employees; servants or agents of Lessee or Lessor, or on account of any infringement or alleged infringement of any patent of any third party, resulting from or relating to the Lessee's operation of the Equipment or the product of such operation.

9.      Insurance

Lessee shall, at its sole expense, place and maintain as and from the date hereof, in a form and with coverage and limits acceptable to Lessor: (a) "all risks" insurance against the loss or theft of or damage to the Equipment for the full replacement value thereof naming Lessor as loss payee, and (b) public liability and property damage insurance naming Lessor as additional insured, covering any liability in respect of the use, operation, possession or ownership of the Equipment. Such insurance policy shall contain a provision prohibiting termination of the policy except upon thirty days' notice by the insurer to Lessor. However, any insurance coverage required hereunder by Lessee shall in no manner restrict or limit the liabilities assumed by Lessee hereunder. Lessee shall furnish to Lessor certified copies or certificates of the said insurance policies. Any insurance proceeds for damage to or destruction of the Equipment shall be paid to Lessor and applied towards satisfaction of Lessee's payment obligations hereunder. In any event, Lessee shall assume the entire risk of, and shall indemnify Lessor for, any loss of or damage to the Equipment.

10.     Equipment to Remain Personal Property

The Equipment shall at all times during the term of this Lease be and remain personal or movable

property, regardless of the manner in which it may be attached to any real estate. Lessee shall install the Equipment in a manner which will permit its removal without material injury to the place of installation. Lessee shall be responsible for any damages done to any real or movable property, building or structure by the removal of the Equipment and shall indemnify and save Lessor harmless therefrom.

11.     Remedies on Default

Upon the happening of any event of default hereunder, Lessor shall be entitled at any time thereafter to do any one or more of the following without prejudice to any other right it may have against Lessee:

(a)     make such payments or take such steps as may be necessary to remedy the default and, upon demand, recover such payments and Lessor's costs incurred from Lessee together with any other sums then due and payable under this Lease;

(b)     terminate this Lease and take possession of the Equipment without demand or notice wherever it may be located and sell, lease or otherwise dispose of the Equipment upon such terms and conditions as Lessor may deem fit;

(c)     recover, as damages for the loss of the bargain and not as a penalty and in lieu of any further claim for periodic rent accruing from and after the date of such termination, a sum, with respect to the Equipment, which represents the excess of the present worth, at the date of such termination, of all rents for the Equipment which would otherwise have accrued hereunder from the date of such termination to the end of the term of this Lease over the then present worth of the then fair market value of the Equipment for such period computed by discounting from the end of such term to the date of such termination rentals which the Lessor reasonably estimates to be obtainable for the use of the Equipment during such period, such present worth to be computed in each case on a basis of a [PERCENTAGE %] per annum discount, compounded from the respective dates on which the rents would have been payable hereunder had this Lease not been terminated;

(d)     recover any damages and expenses which the Lessor shall have sustained by reason of the Lessee's breach of this lease, including but not limited to reasonable sum fees of legal counsel and such expenses as shall be expended or incurred in the seizure, dismantling, rigging, transportation, storage, reassembly, refurbishing, rental or sale of the Equipment;

(e)     upon notice to Lessee, or the agent of Lessee and without terminating the Lease and with or without taking possession of the Equipment, lease the Equipment to any other party for such rental payments and for such period as Lessor may deem fit and receive such rental payments and apply them against any monies payable or to become payable by Lessee under this Lease;

(f)     exercise any other right it may have by law or equity against Lessee.

12.     Events of Default

Any of the following shall each constitute an event of default:

(a)     the failure of Lessee to pay any installment of the rental payment or any other sum due under the terms of this Lease;

(b)     the breach of any covenant or condition contained in this Lease;

(c)     the termination, liquidation, sale or cessation of the Lessee's business;

---

(d)     the subjection of the Equipment to any lien, levy, privilege, hypothec or other secured right or any seizure or attachment;

(e)     any assignment by Lessee for the benefit of its creditors;

(f)     the admission of Lessee in writing of its inability to pay its debts generally as they become due;

(g)     the appointment of a receiver, trustee or similar official for Lessee or for any of its property;

(h)     the filing by or against Lessee of a petition in bankruptcy or petition for the reorganization or liquidation of Lessee under any federal or provincial [YOUR COUNTRY LAW];

(i)     any other act of bankruptcy by Lessee.

13.     Assignment by Lessor

Should Lessor assign the sums due and to become due hereunder to any bank, insurance company or any other person, firm or corporation (of which assignment Lessee hereby waives any notice requirement), Lessee shall recognize such assignment and should Lessor default in the performance of any of the terms and conditions of this Lease, Lessee may not, as to such assignee, terminate this Lease or subject Lessee's obligations to pay money under this Lease to any diminution or right of set-off or compensation. Nothing herein contained shall release Lessor from its obligation to perform any duty, covenant or condition required to be performed by Lessor under the terms of this Lease should the same be sold or assigned.

14.     Return of Equipment Upon Termination

Upon the termination of this Lease for any reason, Lessee shall at its cost, return the Equipment to Lessor at a place designated by Lessor and if Lessee fails to do so, Lessor shall have the right to peaceably enter upon the premises where the Equipment may be and take possession of and remove it at Lessee's expense, all without legal process. In the event that, with or without the consent of Lessor, Lessee remains in the possession of or uses the Equipment after the expiration of the term of this Lease, all of the provisions of this Lease shall apply thereto unless and until the same has been surrendered pursuant to the terms of this clause or Lessor has relieved Lessee from its obligations under this Lease with respect to Equipment. Nothing in this clause shall have the effect of extending or renewing the term of this Lease.

15.     Waiver by Lessor

No covenant or condition of this Lease shall be waived except by the written consent of Lessor, and forbearance and indulgence by Lessor in any regard whatsoever shall not constitute a waiver of the covenant or condition to be performed by Lessee to which the same may apply, and, until complete performance by Lessee of said covenant or condition, Lessor shall be entitled to invoke any remedy available to Lessor under this Lease or by law despite said forbearance or indulgence.

16.     Interest Charges

Should Lessee fail to pay when due any rental payment or any sum required to be paid to Lessor, Lessee shall pay interest on such delinquent payment from the date thereof until paid at the rate of 18% per annum.

17.    Time of Essence

Time is of the essence of this Lease in each and all of its provisions.

18.    Interpretation

It is hereby agreed by and between the parties hereto that wherever the context of this Lease so requires, the singular number shall include the plural and vice versa and that words importing the masculine gender shall include the feminine and neuter genders and that in case more than one lessee is named as "Lessee", the liability of such lessees hereunder shall be joint and several.

19.    Conflict With Applicable Law

Any provision of this Lease prohibited by the applicable [YOUR COUNTRY LAW] of any province or territory shall as to such province or territory be ineffective to the extent of the prohibition without invalidating the remaining provisions of this Lease.

20.    Lessee's Obligations Unconditional

Lessee shall pay or perform its obligations under this Lease unconditionally and without regard to any set-off, counterclaim or equities between Lessee and Lessor.

21.    Remedies Cumulative

All rights and remedies herein provided are cumulative and not exclusive to any other rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise of any other right or remedy.

22.    Entire Agreement

This Lease constitutes the entire agreement between the parties with respect to the Equipment and its rental to and use by the Lessee and supersedes all prior agreements, negotiations, discussions and understandings, written or oral, between the parties, save and except the Purchase and Security Agreement entered into between the parties. There are no other terms, conditions, obligations, representations or warranties on the part of either party, whether oral, written, express, implied, statutory or otherwise, governing or affecting the transactions contemplated in this Lease or which may give rights to the Lessee or restrict the rights and remedies of the Lessor.

**PURCHASE OPTION**

1.      This Purchase Option is hereby incorporated by reference and relates to the lease (the "Lease") between the parties hereto as identified below.

2.      Lessee has the following options (respectively, the "Early Option" and the "Option") to purchase all, but not less than all, of the Equipment described in the Lease Agreement, on an as-is where-is basis:

   2.1      in the case of the Early Option, at any time after the due date of the first (1st) monthly payment and prior to the due date of the sixtieth (60th) monthly payment (the "Early Option Period") in respect of the Equipment, for a purchase price equal to the principal balance remaining based on the amortization schedule;

   2.2      in the case of the Option, on August 20th, 2022 (the "Option Date") in respect of the Equipment for a purchase price of one dollar, ($1.00)

3.      The Early Option or the Option may be exercised only if Lessee is not in default under the Lease both at the time of exercise and throughout the Early Option Period or at the Option Date (as the case may be).

4.      All terms used herein shall have the meanings set forth in the Lease and the other terms and conditions of the Lease shall apply hereto, mutatis mutandis.

5.      This purchase option shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. This purchase option is not assignable by Lessee without the prior written consent of Lessor.

IN WITNESS WHEREOF, each party to this agreement has caused it to be executed at 3760 E Seltice Way, POST FALLS, IDAHO on the date indicated above.

**LESSOR**                                               **LESSEE**

_____                    _____
Authorized Signature                                 Authorized Signature

_KARL THATCHER MEMBER_          _Clinton Arnold General/Manager_
Print Name and Title                                 Print Name and Title

# EQUIPMENT LEASE – WITH PURCHASE OPTION

*8316*

This Equipment Lease – Purchase Option (the "Agreement") is effective [DATE],

**BETWEEN:**  **Precision Farming Group, inc.** (the "Lessee"), a company organized and existing under the laws of the State of Idaho, with its head office located at:

3760 E Seltice Way, Post Falls, Idaho, 83854, United States

**AND:**  **HIGHWAY SPECIALTIES** (the "Lessor"), a company organized and existing under the laws of the State of Oregon, with its head office located at:

PO Box 9180, Salem OR 97305

WITNESSETH:

WHEREAS the Lessor wishes to enter into an operating lease with the Lessee for the equipment hereinafter described;

WHEREAS the Lessee wishes to lease such equipment from the Lessor on the basis of the operating lease terms and conditions hereinafter set forth;

NOW THEREFORE, the parties hereby agree as follows:

## 1. LEASE AGREEMENT

1.1 Lessor hereby leases to Lessee, and Lessee hereby rents from Lessor all the machinery, equipment and other personal and movable property (hereinafter collectively called the "Equipment" and individually an "item" of Equipment) described in Schedule "A" hereto or in such replacement equipment lease schedules which may from time to time hereafter be executed by Lessor and Lessee and attached hereto or incorporated herein by reference, upon the terms and conditions set forth in this Lease, as supplemented by the terms and conditions set forth in the appropriate schedule identifying such items of Equipment.

1.2 All of the terms and conditions of this Lease shall govern the rights and obligations of Lessor and Lessee except as specifically modified in writing. Whenever reference is made herein to "this Lease", it shall be deemed to include each of the various schedules identifying all items of Equipment and any additional terms applying to any item of Equipment, all of which constitute one undivided lease of the Equipment on the terms and conditions incorporated herein by reference.

## 2. TERM

2.1 The obligations under this Lease in respect of the Equipment shall commence as of and from July 1st 2017, and shall continue for 60 months inclusively (provided Lessee is not in default hereunder at such time) and unless terminated prior thereto pursuant to the provisions hereof and unless modified by any schedule.

3.    **RENTAL PAYMENTS**

3.1    Lessee shall pay to Lessor as rent for the Equipment monthly rent payments during the term of this Lease in the amount of Three Thousand Three Hundred Forty Two Dollars ($3,342.59) each month.

3.2    The first rental payment shall be due and payable on August 20th, 2017, and the subsequent monthly rental payments shall be due on the 20th day of each month thereafter during the term hereof, each at the office of the Lessor, PO Box 9180, Salem Oregon, 97305, United States, or at the offices of its assigns (or at such other place as Lessor from time to time designates in writing). The receipt of any check or other item on account of any rental payment will not be considered as payment thereof unless such check or other item is honored when presented for payment.

4.    **TERMS AND CONDITIONS OF LEASE**

4.1    The terms and conditions of this Lease annexed hereto as Schedule "B" are incorporated herein by reference as if fully set forth herein and shall be deemed to form an integral part of this Lease.

5.    **GENERAL TERMS**

5.1    This Lease shall be interpreted and construed in accordance with the laws of the State of Oregon and treated in all respects as an Oregon contract.

5.2    All amounts expressed herein and in the various Schedules hereto are in legal tender of United States (United States $), unless expressly provided otherwise.

5.3    This Lease shall enure to the benefit of and be binding upon Lessor and Lessee and their respective successors and permitted assigns.

5.4    This Lease and the rights and obligations hereunder may not be assigned by Lessee without the prior express written consent of Lessor. Lessor may assign this Lease and its rights and obligations hereunder at any time in whole or in part.

5.5    Lessee acknowledges that all additional security now or hereafter held by Lessor as security for any debts or obligations of Lessee to Lessor shall secure the obligations of Lessee to Lessor under this Lease.

5.6    Lessee hereby acknowledges receipt of an executed copy of this Lease.


IN WITNESS WHEREOF, each party to this agreement has caused it to be executed at [PLACE OF EXECUTION] on the date indicated above.


**LESSOR**                                    **LESSEE**


_____                       _____
Authorized Signature                          Authorized Signature

KARL THATCHER MEMBER                           Clifton Arnold General Manager
Print Name and Title                          Print Name and Title


Equipment Lease – Purchase Option                              Page 2 of 9

**EQUIPMENT DESCRIPTION**

Schedule A

2016-299DS Caterpillar Multi-Terrain
SMU: 24hrs ID:E0008316
Caterpillar Remote
Farb Guidance Software
Navigation Equipment

## SCHEDULE B
## TERMS AND CONDITIONS OF LEASE

1.  Warranty Limits and Disclaimer

    The terms and conditions set out in the Purchase and Security Agreement between Precision Farming Group, inc. and Lessee dated [DATE] regarding warranty limits and disclaimers with respect to the items of Equipment respectively dealt with therein are incorporated herein by reference as if herein set forth at length. Without limiting the generality of the foregoing, LESSOR HEREBY DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES AND CONDITIONS (INCLUDING BUT NOT LIMITED TO WARRANTIES AND CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND ANY AGREEMENTS, REPRESENTATIONS, AFFIRMATIONS OR WARRANTIES, WHETHER ORAL OR WRITTEN, MADE BY ANY AGENT, EMPLOYEE OR REPRESENTATIVE OF LESSOR, UNLESS SPECIFICALLY SET FORTH IN THIS PARAGRAPH OR SPECIFICALLY INCORPORATED HEREIN BY REFERENCE.

    LESSOR'S LIABILITY FOR ANY DEFECT IN MATERIAL OR WORKMANSHIP OF THE EQUIPMENT IS LIMITED TO THE WARRANTY SET FORTH IN THIS PARAGRAPH AND LESSOR SHALL NOT BE LIABLE FOR BREACH OF CONTRACT ARISING FROM ANY DEFECT IN MATERIAL OR WORKMANSHIP OF THE EQUIPMENT. IN NO EVENT SHALL LESSOR BE LIABLE FOR LOSSES BASED UPON DOWNTIME, OVERHEAD, LOST LABOUR, DAMAGES TO MACHINERY, SPOILAGE, LOST PRODUCTION OR PROFITS OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS TRANSACTION. LESSOR SHALL NOT BE LIABLE FOR ANY OTHER FAILURES OR DEFECTS. Except as expressly provided above, Lessee agrees that Lessor has not given any express or implied representation or warranty as to the design, merchantability, suitability, durability or condition of the Equipment and the doctrine of fundamental breach shall have no application to this Lease.

2.  Equipment Owned by Lessor

    This Lease is one of leasing only and Lessee shall not have or acquire any right, title or interest in or to the Equipment, which shall remain with Lessor, except the right of Lessee and its competent employees to use or operate the Equipment as provided herein. Lessee hereby expressly waives any rights, benefits or protection given to it by the laws, present or future, of any jurisdiction, in favor of conditional sales lessees or bailees.

3.  Loss or Damage to Equipment

    Lessee assumes the entire risk of loss of or damage to the Equipment from any cause whatsoever. No loss or damage to the Equipment or any part thereof shall affect or impair the obligations of Lessee hereunder which shall continue in full force and effect.

4.  No Sublease or Assignment of Lease by Lessee

    Lessee shall not transfer, deliver up possession of, or sublet the Equipment and this Lease and the rights and obligations thereunder shall not be assignable by Lessee without the written consent of the Lessor, which consent may not be unreasonably withheld. Lessor may at any time, whether with or without notice to Lessee, assign, pledge, mortgage, transfer or otherwise dispose of, either in whole or in part, its rights hereunder.

5.  Maintenance and Inspection of Equipment

    Lessee shall at all times and at Lessee's own expense keep the Equipment in good and efficient working order and repair and shall furnish any and all parts, mechanisms and devices required to

keep the Equipment in good mechanical and working order. Lessor, its employees and/or agents shall at all times have access to the Equipment for the purpose of inspecting it. Lessee shall not, without the prior written consent of the Lessor, make any alterations, additions or improvements to the Equipment. All such alterations or improvements so made shall belong to and remain the property of Lessor.

6.    Compliance by Lessee With All laws, Ordinances, Etc.

Lessee shall comply with and conform to all laws, ordinances and regulations, present or future, in any way relating to the ownership, possession, use or maintenance of the Equipment throughout the term of this Lease and to the full and complete exoneration from liability of Lessor. Lessor shall not be liable for any special or consequential damages as a result of any act or omission of Lessor under this Lease.

7.    Equipment to be Kept Free of Levies, Privileges, Liens, Charges, Etc.

Lessee shall keep the Equipment free of levies, privileges, liens and encumbrances and shall pay all license fees, registration fees, assessments, charges and taxes (municipal, state/provincial and federal) which may be levied or assessed, directly or indirectly, against or on account of the Equipment or any interest thereon or use thereof. This Lease is a net lease and every cost or expense existing or arising with respect to the Equipment or Lessee's lease, possession or use thereof and all Taxes shall be borne by the Lessee. If Lessee shall fail to pay such license fees, registration fees, assessments, charges or Taxes, Lessor may pay the same, in which event the cost thereof shall be forthwith due and payable by Lessee.

8.    Indemnification of Lessor by Lessee

Lessee hereby indemnifies Lessor against and holds Lessor harmless from any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including legal fees, arising out of or connected with or resulting from the Equipment, including, without limitation, the manufacture, selection, delivery, installation, possession, use, operation or return of the Equipment or otherwise on account of any personal injury or death or damage to property occasioned by the Equipment or the negligence of the employees; servants or agents of Lessee or Lessor, or on account of any infringement or alleged infringement of any patent of any third party, resulting from or relating to the Lessee's operation of the Equipment or the product of such operation.

9.    Insurance

Lessee shall, at its sole expense, place and maintain as and from the date hereof, in a form and with coverage and limits acceptable to Lessor: (a)  "all risks" insurance against the loss or theft of or damage to the Equipment for the full replacement value thereof naming Lessor as loss payee, and (b) public liability and property damage insurance naming Lessor as additional insured, covering any liability in respect of the use, operation, possession or ownership of the Equipment. Such insurance policy shall contain a provision prohibiting termination of the policy except upon thirty days' notice by the insurer to Lessor. However, any insurance coverage required hereunder by Lessee shall in no manner restrict or limit the liabilities assumed by Lessee hereunder. Lessee shall furnish to Lessor certified copies or certificates of the said insurance policies. Any insurance proceeds for damage to or destruction of the Equipment shall be paid to Lessor and applied towards satisfaction of Lessee's payment obligations hereunder. In any event, Lessee shall assume the entire risk of, and shall indemnify Lessor for, any loss of or damage to the Equipment.

10.    Equipment to Remain Personal Property

The Equipment shall at all times during the term of this Lease be and remain personal or movable property, regardless of the manner in which it may be attached to any real estate. Lessee shall

install the Equipment in a manner which will permit its removal without material injury to the place of installation. Lessee shall be responsible for any damages done to any real or movable property, building or structure by the removal of the Equipment and shall indemnify and save Lessor harmless therefrom.

11.  Remedies on Default

Upon the happening of any event of default hereunder, Lessor shall be entitled at any time thereafter to do any one or more of the following without prejudice to any other right it may have against Lessee:

(a)  make such payments or take such steps as may be necessary to remedy the default and, upon demand, recover such payments and Lessor's costs incurred from Lessee together with any other sums then due and payable under this Lease;

(b)  terminate this Lease and take possession of the Equipment without demand or notice wherever it may be located and sell, lease or otherwise dispose of the Equipment upon such terms and conditions as Lessor may deem fit;

(c)  recover, as damages for the loss of the bargain and not as a penalty and in lieu of any further claim for periodic rent accruing from and after the date of such termination, a sum, with respect to the Equipment, which represents the excess of the present worth, at the date of such termination, of all rents for the Equipment which would otherwise have accrued hereunder from the date of such termination to the end of the term of this Lease over the then present worth of the then fair market value of the Equipment for such period computed by discounting from the end of such term to the date of such termination rentals which the Lessor reasonably estimates to be obtainable for the use of the Equipment during such period, such present worth to be computed in each case on a basis of a [PERCENTAGE %] per annum discount, compounded from the respective dates on which the rents would have been payable hereunder had this Lease not been terminated;

(d)  recover any damages and expenses which the Lessor shall have sustained by reason of the Lessee's breach of this lease, including but not limited to reasonable sum fees of legal counsel and such expenses as shall be expended or incurred in the seizure, dismantling, rigging, transportation, storage, reassembly, refurbishing, rental or sale of the Equipment;

(e)  upon notice to Lessee, or the agent of Lessee and without terminating the Lease and with or without taking possession of the Equipment, lease the Equipment to any other party for such rental payments and for such period as Lessor may deem fit and receive such rental payments and apply them against any monies payable or to become payable by Lessee under this Lease;

(f)  exercise any other right it may have by law or equity against Lessee.

12.  Events of Default

Any of the following shall each constitute an event of default:

(a)  the failure of Lessee to pay any installment of the rental payment or any other sum due under the terms of this Lease;

(b)  the breach of any covenant or condition contained in this Lease;

(c)  the termination, liquidation, sale or cessation of the Lessee's business;

(d)    the subjection of the Equipment to any lien, levy, privilege, hypothec or other secured right or any seizure or attachment;

(e)    any assignment by Lessee for the benefit of its creditors;

(f)    the admission of Lessee in writing of its inability to pay its debts generally as they become due;

(g)    the appointment of a receiver, trustee or similar official for Lessee or for any of its property;

(h)    the filing by or against Lessee of a petition in bankruptcy or petition for the reorganization or liquidation of Lessee under any federal or provincial [YOUR COUNTRY LAW];

(i)    any other act of bankruptcy by Lessee.

13.    Assignment by Lessor

Should Lessor assign the sums due and to become due hereunder to any bank, insurance company or any other person, firm or corporation (of which assignment Lessee hereby waives any notice requirement), Lessee shall recognize such assignment and should Lessor default in the performance of any of the terms and conditions of this Lease, Lessee may not, as to such assignee, terminate this Lease or subject Lessee's obligations to pay money under this Lease to any diminution or right of set-off or compensation. Nothing herein contained shall release Lessor from its obligation to perform any duty, covenant or condition required to be performed by Lessor under the terms of this Lease should the same be sold or assigned.

14.    Return of Equipment Upon Termination

Upon the termination of this Lease for any reason, Lessee shall at its cost, return the Equipment to Lessor at a place designated by Lessor and if Lessee fails to do so, Lessor shall have the right to peaceably enter upon the premises where the Equipment may be and take possession of and remove it at Lessee's expense, all without legal process. In the event that, with or without the consent of Lessor, Lessee remains in the possession of or uses the Equipment after the expiration of the term of this Lease, all of the provisions of this Lease shall apply thereto unless and until the same has been surrendered pursuant to the terms of this clause or Lessor has relieved Lessee from its obligations under this Lease with respect to Equipment. Nothing in this clause shall have the effect of extending or renewing the term of this Lease.

15.    Waiver by Lessor

No covenant or condition of this Lease shall be waived except by the written consent of Lessor, and forbearance and indulgence by Lessor in any regard whatsoever shall not constitute a waiver of the covenant or condition to be performed by Lessee to which the same may apply, and, until complete performance by Lessee of said covenant or condition, Lessor shall be entitled to invoke any remedy available to Lessor under this Lease or by law despite said forbearance or indulgence.

16.    Interest Charges

Should Lessee fail to pay when due any rental payment or any sum required to be paid to Lessor, Lessee shall pay interest on such delinquent payment from the date thereof until paid at the rate of 18% per annum.

17.   Time of Essence

Time is of the essence of this Lease in each and all of its provisions.

18.   Interpretation

It is hereby agreed by and between the parties hereto that wherever the context of this Lease so requires, the singular number shall include the plural and vice versa and that words importing the masculine gender shall include the feminine and neuter genders and that in case more than one lessee is named as "Lessee", the liability of such lessees hereunder shall be joint and several.

19.   Conflict With Applicable Law

Any provision of this Lease prohibited by the applicable [YOUR COUNTRY LAW] of any province or territory shall as to such province or territory be ineffective to the extent of the prohibition without invalidating the remaining provisions of this Lease.

20.   Lessee's Obligations Unconditional

Lessee shall pay or perform its obligations under this Lease unconditionally and without regard to any set-off, counterclaim or equities between Lessee and Lessor.

21.   Remedies Cumulative

All rights and remedies herein provided are cumulative and not exclusive to any other rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise of any other right or remedy.

22.   Entire Agreement

This Lease constitutes the entire agreement between the parties with respect to the Equipment and its rental to and use by the Lessee and supersedes all prior agreements, negotiations, discussions and understandings, written or oral, between the parties, save and except the Purchase and Security Agreement entered into between the parties. There are no other terms, conditions, obligations, representations or warranties on the part of either party, whether oral, written, express, implied, statutory or otherwise, governing or affecting the transactions contemplated in this Lease or which may give rights to the Lessee or restrict the rights and remedies of the Lessor.

## PURCHASE OPTION

1. This Purchase Option is hereby incorporated by reference and relates to the lease (the "Lease") between the parties hereto as identified below.

2. Lessee has the following options (respectively, the "Early Option" and the "Option") to purchase all, but not less than all, of the Equipment described in the Lease Agreement, on an as-is where-is basis:

    2.1    in the case of the Early Option, at any time after the due date of the first (1st) monthly payment and prior to the due date of the sixtieth (60th) monthly payment (the "Early Option Period") in respect of the Equipment, for a purchase price equal to the principal balance remaining based on the amortization schedule;

    1..2    in the case of the Option, on August 20th, 2022 (the "Option Date") in respect of the Equipment for a purchase price of one dollar, ($1.00)

3. The Early Option or the Option may be exercised only if Lessee is not in default under the Lease both at the time of exercise and throughout the Early Option Period or at the Option Date (as the case may be).

4. All terms used herein shall have the meanings set forth in the Lease and the other terms and conditions of the Lease shall apply hereto, mutatis mutandis.

5. This purchase option shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. This purchase option is not assignable by Lessee without the prior written consent of Lessor.

IN WITNESS WHEREOF, each party to this agreement has caused it to be executed at 3760 E Seltice Way, POST FALLS, IDAHO on the date indicated above.

**LESSOR**                                         **LESSEE**

_____                  _____
Authorized Signature                           Authorized Signature

KARL THATCHER member               Clinton Arnold General Manager
Print Name and Title                            Print Name and Title

Equipment Lease – Purchase Option                                    Page 9 of 9

# EQUIPMENT LEASE – WITH PURCHASE OPTION

*Unit# 1664*

This Equipment Lease – Purchase Option (the "Agreement") is effective 05/01/2017__,

**BETWEEN:**   **Precision Farming Group, inc.** (the "Lessee"), a company organized and existing under the laws of the State of Idaho, with its head office located at:

3760 E Seltice Way, Post Falls, Idaho, 83854, United States

**AND:**   **HIGHWAY SPECIALTIES** (the "Lessor"), a company organized and existing under the laws of the State of Oregon, with its head office located at:

PO Box 9180, Salem OR 97305

WITNESSETH:

WHEREAS the Lessor wishes to enter into an operating lease with the Lessee for the equipment hereinafter described;

WHEREAS the Lessee wishes to lease such equipment from the Lessor on the basis of the operating lease terms and conditions hereinafter set forth;

NOW THEREFORE, the parties hereby agree as follows:

**1.   LEASE AGREEMENT**

1.1   Lessor hereby leases to Lessee, and Lessee hereby rents from Lessor all the machinery, equipment and other personal and movable property (hereinafter collectively called the "Equipment" and individually an "item" of Equipment) described in Schedule "A" hereto or in such replacement equipment lease schedules which may from time to time hereafter be executed by Lessor and Lessee and attached hereto or incorporated herein by reference, upon the terms and conditions set forth in this Lease, as supplemented by the terms and conditions set forth in the appropriate schedule identifying such items of Equipment.

1.2   All of the terms and conditions of this Lease shall govern the rights and obligations of Lessor and Lessee except as specifically modified in writing. Whenever reference is made herein to "this Lease", it shall be deemed to include each of the various schedules identifying all items of Equipment and any additional terms applying to any item of Equipment, all of which constitute one undivided lease of the Equipment on the terms and conditions incorporated herein by reference.

**2.   TERM**

2.1   The obligations under this Lease in respect of the Equipment shall commence as of and from July 1st 2017, and shall continue for 60 months inclusively (provided Lessee is not in default hereunder at such time) and unless terminated prior thereto pursuant to the provisions hereof and unless modified by any schedule.

**3.      RENTAL PAYMENTS**

3.1      Lessee shall pay to Lessor as rent for the Equipment monthly rent payments during the term of this Lease in the amount of Three Thousand Three Hundred Forty Two Dollars ($3,342.59) each month.

3.2      The first rental payment shall be due and payable on August 20th, 2017, and the subsequent monthly rental payments shall be due on the 20th day of each month thereafter during the term hereof, each at the office of the Lessor, PO Box 9180, Salem Oregon, 97305, United States, or at the offices of its assigns (or at such other place as Lessor from time to time designates in writing). The receipt of any check or other item on account of any rental payment will not be considered as payment thereof unless such check or other item is honored when presented for payment.

**4.      TERMS AND CONDITIONS OF LEASE**

4.1      The terms and conditions of this Lease annexed hereto as Schedule "B" are incorporated herein by reference as if fully set forth herein and shall be deemed to form an integral part of this Lease.

**5.      GENERAL TERMS**

5.1      This Lease shall be interpreted and construed in accordance with the laws of the State of Oregon and treated in all respects as an Oregon contract.

5.2      All amounts expressed herein and in the various Schedules hereto are in legal tender of United States (United States $), unless expressly provided otherwise.

5.3      This Lease shall enure to the benefit of and be binding upon Lessor and Lessee and their respective successors and permitted assigns.

5.4      This Lease and the rights and obligations hereunder may not be assigned by Lessee without the prior express written consent of Lessor. Lessor may assign this Lease and its rights and obligations hereunder at any time in whole or in part.

5.5      Lessee acknowledges that all additional security now or hereafter held by Lessor as security for any debts or obligations of Lessee to Lessor shall secure the obligations of Lessee to Lessor under this Lease.

5.6      Lessee hereby acknowledges receipt of an executed copy of this Lease.


IN WITNESS WHEREOF, each party to this agreement has caused it to be executed at [PLACE OF EXECUTION] on the date indicated above.


**LESSOR**                                                    **LESSEE**


_____          _____
Authorized Signature                                    Authorized Signature


_____          _____
Print Name and Title                                    Print Name and Title

**EQUIPMENT DESCRIPTION**

Schedule A

2016-299DS Caterpillar Multi-Terrain
SMU: 4.3hrs ID: FD201664
Caterpillar Remote
Farb Guidance Software
Navigation Equipment

## SCHEDULE B
## TERMS AND CONDITIONS OF LEASE

1. Warranty Limits and Disclaimer

The terms and conditions set out in the Purchase and Security Agreement between Precision Farming Group, inc. and Lessee dated [DATE] regarding warranty limits and disclaimers with respect to the items of Equipment respectively dealt with therein are incorporated herein by reference as if herein set forth at length. Without limiting the generality of the foregoing, LESSOR HEREBY DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES AND CONDITIONS (INCLUDING BUT NOT LIMITED TO WARRANTIES AND CONDITIONS OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE), AND ANY AGREEMENTS, REPRESENTATIONS, AFFIRMATIONS OR WARRANTIES, WHETHER ORAL OR WRITTEN, MADE BY ANY AGENT, EMPLOYEE OR REPRESENTATIVE OF LESSOR, UNLESS SPECIFICALLY SET FORTH IN THIS PARAGRAPH OR SPECIFICALLY INCORPORATED HEREIN BY REFERENCE.

LESSOR'S LIABILITY FOR ANY DEFECT IN MATERIAL OR WORKMANSHIP OF THE EQUIPMENT IS LIMITED TO THE WARRANTY SET FORTH IN THIS PARAGRAPH AND LESSOR SHALL NOT BE LIABLE FOR BREACH OF CONTRACT ARISING FROM ANY DEFECT IN MATERIAL OR WORKMANSHIP OF THE EQUIPMENT. IN NO EVENT SHALL LESSOR BE LIABLE FOR LOSSES BASED UPON DOWNTIME, OVERHEAD, LOST LABOUR, DAMAGES TO MACHINERY, SPOILAGE, LOST PRODUCTION OR PROFITS OR CONSEQUENTIAL DAMAGES OF ANY KIND ARISING OUT OF OR IN CONNECTION WITH THIS TRANSACTION. LESSOR SHALL NOT BE LIABLE FOR ANY OTHER FAILURES OR DEFECTS. Except as expressly provided above, Lessee agrees that Lessor has not given any express or implied representation or warranty as to the design, merchantability, suitability, durability or condition of the Equipment and the doctrine of fundamental breach shall have no application to this Lease.

2. Equipment Owned by Lessor

This Lease is one of leasing only and Lessee shall not have or acquire any right, title or interest in or to the Equipment, which shall remain with Lessor, except the right of Lessee and its competent employees to use or operate the Equipment as provided herein. Lessee hereby expressly waives any rights, benefits or protection given to it by the laws, present or future, of any jurisdiction, in favor of conditional sales lessees or bailees.

3. Loss or Damage to Equipment

Lessee assumes the entire risk of loss of or damage to the Equipment from any cause whatsoever. No loss or damage to the Equipment or any part thereof shall affect or impair the obligations of Lessee hereunder which shall continue in full force and effect.

4. No Sublease or Assignment of Lease by Lessee

Lessee shall not transfer, deliver up possession of, or sublet the Equipment and this Lease and the rights and obligations thereunder shall not be assignable by Lessee without the written consent of the Lessor, which consent may not be unreasonably withheld. Lessor may at any time, whether with or without notice to Lessee, assign, pledge, mortgage, transfer or otherwise dispose of, either in whole or in part, its rights hereunder.

5. Maintenance and Inspection of Equipment

Lessee shall at all times and at Lessee's own expense keep the Equipment in good and efficient working order and repair and shall furnish any and all parts, mechanisms and devices required to

keep the Equipment in good mechanical and working order. Lessor, its employees and/or agents shall at all times have access to the Equipment for the purpose of inspecting it. Lessee shall not, without the prior written consent of the Lessor, make any alterations, additions or improvements to the Equipment. All such alterations or improvements so made shall belong to and remain the property of Lessor.

6.      Compliance by Lessee With All laws, Ordinances, Etc.

Lessee shall comply with and conform to all laws, ordinances and regulations, present or future, in any way relating to the ownership, possession, use or maintenance of the Equipment throughout the term of this Lease and to the full and complete exoneration from liability of Lessor. Lessor shall not be liable for any special or consequential damages as a result of any act or omission of Lessor under this Lease.

7.      Equipment to be Kept Free of Levies, Privileges, Liens, Charges, Etc.

Lessee shall keep the Equipment free of levies, privileges, liens and encumbrances and shall pay all license fees, registration fees, assessments, charges and taxes (municipal, state/provincial and federal) which may be levied or assessed, directly or indirectly, against or on account of the Equipment or any interest thereon or use thereof. This Lease is a net lease and every cost or expense existing or arising with respect to the Equipment or Lessee's lease, possession or use thereof and all Taxes shall be borne by the Lessee. If Lessee shall fail to pay such license fees, registration fees, assessments, charges or Taxes, Lessor may pay the same, in which event the cost thereof shall be forthwith due and payable by Lessee.

8.      Indemnification of Lessor by Lessee

Lessee hereby indemnifies Lessor against and holds Lessor harmless from any and all claims, actions, suits, proceedings, costs, expenses, damages and liabilities, including legal fees, arising out of or connected with or resulting from the Equipment, including, without limitation, the manufacture, selection, delivery, installation, possession, use, operation or return of the Equipment or otherwise on account of any personal injury or death or damage to property occasioned by the Equipment or the negligence of the employees; servants or agents of Lessee or Lessor, or on account of any infringement or alleged infringement of any patent of any third party, resulting from or relating to the Lessee's operation of the Equipment or the product of such operation.

9.      Insurance

Lessee shall, at its sole expense, place and maintain as and from the date hereof, in a form and with coverage and limits acceptable to Lessor: (a)  "all risks" insurance against the loss or theft of or damage to the Equipment for the full replacement value thereof naming Lessor as loss payee, and (b) public liability and property damage insurance naming Lessor as additional insured, covering any liability in respect of the use, operation, possession or ownership of the Equipment. Such insurance policy shall contain a provision prohibiting termination of the policy except upon thirty days' notice by the insurer to Lessor. However, any insurance coverage required hereunder by Lessee shall in no manner restrict or limit the liabilities assumed by Lessee hereunder. Lessee shall furnish to Lessor certified copies or certificates of the said insurance policies. Any insurance proceeds for damage to or destruction of the Equipment shall be paid to Lessor and applied towards satisfaction of Lessee's payment obligations hereunder. In any event, Lessee shall assume the entire risk of, and shall indemnify Lessor for, any loss of or damage to the Equipment.

10.     Equipment to Remain Personal Property

The Equipment shall at all times during the term of this Lease be and remain personal or movable property, regardless of the manner in which it may be attached to any real estate. Lessee shall

install the Equipment in a manner which will permit its removal without material injury to the place of installation. Lessee shall be responsible for any damages done to any real or movable property, building or structure by the removal of the Equipment and shall indemnify and save Lessor harmless therefrom.

11.     Remedies on Default

Upon the happening of any event of default hereunder, Lessor shall be entitled at any time thereafter to do any one or more of the following without prejudice to any other right it may have against Lessee:

(a)     make such payments or take such steps as may be necessary to remedy the default and, upon demand, recover such payments and Lessor's costs incurred from Lessee together with any other sums then due and payable under this Lease;

(b)     terminate this Lease and take possession of the Equipment without demand or notice wherever it may be located and sell, lease or otherwise dispose of the Equipment upon such terms and conditions as Lessor may deem fit;

(c)     recover, as damages for the loss of the bargain and not as a penalty and in lieu of any further claim for periodic rent accruing from and after the date of such termination, a sum, with respect to the Equipment, which represents the excess of the present worth, at the date of such termination, of all rents for the Equipment which would otherwise have accrued hereunder from the date of such termination to the end of the term of this Lease over the then present worth of the then fair market value of the Equipment for such period computed by discounting from the end of such term to the date of such termination rentals which the Lessor reasonably estimates to be obtainable for the use of the Equipment during such period, such present worth to be computed in each case on a basis of a [PERCENTAGE %] per annum discount, compounded from the respective dates on which the rents would have been payable hereunder had this Lease not been terminated;

(d)     recover any damages and expenses which the Lessor shall have sustained by reason of the Lessee's breach of this lease, including but not limited to reasonable sum fees of legal counsel and such expenses as shall be expended or incurred in the seizure, dismantling, rigging, transportation, storage, reassembly, refurbishing, rental or sale of the Equipment;

(e)     upon notice to Lessee, or the agent of Lessee and without terminating the Lease and with or without taking possession of the Equipment, lease the Equipment to any other party for such rental payments and for such period as Lessor may deem fit and receive such rental payments and apply them against any monies payable or to become payable by Lessee under this Lease;

(f)     exercise any other right it may have by law or equity against Lessee.

12.     Events of Default

Any of the following shall each constitute an event of default:

(a)     the failure of Lessee to pay any installment of the rental payment or any other sum due under the terms of this Lease;

(b)     the breach of any covenant or condition contained in this Lease;

(c)     the termination, liquidation, sale or cessation of the Lessee's business;

(d)    the subjection of the Equipment to any lien, levy, privilege, hypothec or other secured right or any seizure or attachment;

(e)    any assignment by Lessee for the benefit of its creditors;

(f)    the admission of Lessee in writing of its inability to pay its debts generally as they become due;

(g)    the appointment of a receiver, trustee or similar official for Lessee or for any of its property;

(h)    the filing by or against Lessee of a petition in bankruptcy or petition for the reorganization or liquidation of Lessee under any federal or provincial [YOUR COUNTRY LAW];

(i)    any other act of bankruptcy by Lessee.

13.    Assignment by Lessor

Should Lessor assign the sums due and to become due hereunder to any bank, insurance company or any other person, firm or corporation (of which assignment Lessee hereby waives any notice requirement), Lessee shall recognize such assignment and should Lessor default in the performance of any of the terms and conditions of this Lease, Lessee may not, as to such assignee, terminate this Lease or subject Lessee's obligations to pay money under this Lease to any diminution or right of set-off or compensation. Nothing herein contained shall release Lessor from its obligation to perform any duty, covenant or condition required to be performed by Lessor under the terms of this Lease should the same be sold or assigned.

14.    Return of Equipment Upon Termination

Upon the termination of this Lease for any reason, Lessee shall at its cost, return the Equipment to Lessor at a place designated by Lessor and if Lessee fails to do so, Lessor shall have the right to peaceably enter upon the premises where the Equipment may be and take possession of and remove it at Lessee's expense, all without legal process. In the event that, with or without the consent of Lessor, Lessee remains in the possession of or uses the Equipment after the expiration of the term of this Lease, all of the provisions of this Lease shall apply thereto unless and until the same has been surrendered pursuant to the terms of this clause or Lessor has relieved Lessee from its obligations under this Lease with respect to Equipment. Nothing in this clause shall have the effect of extending or renewing the term of this Lease.

15.    Waiver by Lessor

No covenant or condition of this Lease shall be waived except by the written consent of Lessor, and forbearance and indulgence by Lessor in any regard whatsoever shall not constitute a waiver of the covenant or condition to be performed by Lessee to which the same may apply, and, until complete performance by Lessee of said covenant or condition, Lessor shall be entitled to invoke any remedy available to Lessor under this Lease or by law despite said forbearance or indulgence.

16.    Interest Charges

Should Lessee fail to pay when due any rental payment or any sum required to be paid to Lessor, Lessee shall pay interest on such delinquent payment from the date thereof until paid at the rate of 18% per annum.

17.     Time of Essence

        Time is of the essence of this Lease in each and all of its provisions.

18.     Interpretation

        It is hereby agreed by and between the parties hereto that wherever the context of this Lease so requires, the singular number shall include the plural and vice versa and that words importing the masculine gender shall include the feminine and neuter genders and that in case more than one lessee is named as "Lessee", the liability of such lessees hereunder shall be joint and several.

19.     Conflict With Applicable Law

        Any provision of this Lease prohibited by the applicable [YOUR COUNTRY LAW] of any province or territory shall as to such province or territory be ineffective to the extent of the prohibition without invalidating the remaining provisions of this Lease.

20.     Lessee's Obligations Unconditional

        Lessee shall pay or perform its obligations under this Lease unconditionally and without regard to any set-off, counterclaim or equities between Lessee and Lessor.

21.     Remedies Cumulative

        All rights and remedies herein provided are cumulative and not exclusive to any other rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise of any other right or remedy.

22.     Entire Agreement

        This Lease constitutes the entire agreement between the parties with respect to the Equipment and its rental to and use by the Lessee and supersedes all prior agreements, negotiations, discussions and understandings, written or oral, between the parties, save and except the Purchase and Security Agreement entered into between the parties. There are no other terms, conditions, obligations, representations or warranties on the part of either party, whether oral, written, express, implied, statutory or otherwise, governing or affecting the transactions contemplated in this Lease or which may give rights to the Lessee or restrict the rights and remedies of the Lessor.

### PURCHASE OPTION

1.   This Purchase Option is hereby incorporated by reference and relates to the lease (the "Lease") between the parties hereto as identified below.

2.   Lessee has the following options (respectively, the "Early Option" and the "Option") to purchase all, but not less than all, of the Equipment described in the Lease Agreement, on an as-is where-is basis:

   2.1   in the case of the Early Option, at any time after the due date of the first (1st) monthly payment and prior to the due date of the sixtieth (60th) monthly payment (the "Early Option Period") in respect of the Equipment, for a purchase price equal to the principal balance remaining based on the amortization schedule;

   1..2   in the case of the Option, on August 20th, 2022 (the "Option Date") in respect of the Equipment for a purchase price of one dollar, ($1.00)

3.   The Early Option or the Option may be exercised only if Lessee is not in default under the Lease both at the time of exercise and throughout the Early Option Period or at the Option Date (as the case may be).

4.   All terms used herein shall have the meanings set forth in the Lease and the other terms and conditions of the Lease shall apply hereto, mutatis mutandis.

5.   This purchase option shall enure to the benefit of and be binding upon the parties hereto and their respective successors and assigns. This purchase option is not assignable by Lessee without the prior written consent of Lessor.

IN WITNESS WHEREOF, each party to this agreement has caused it to be executed at 3760 E Seltice Way, POST FALLS, IDAHO on the date indicated above.

**LESSOR**

_____
Authorized Signature

_____
Print Name and Title

**LESSEE**

_____
Authorized Signature

_____
Print Name and Title

EXHIBIT B



PETER J. SMITH IV
peter@smithmalek.com
Admitted in Idaho and Washington

April 1, 2019

Via Certified Mail

Dave Farb
2512 N. Chase Rd.
Liberty Lake, WA 99019

Re:     Farb Guidance Systems, Inc. - Accounting

Dear Mr. Farb:

This firm represents Karl Thatcher. As you know, Mr. Thatcher loaned money to Precision Farming Group, Inc. and owns shares Farb Guidance Systems, Inc.

Mr. Thatcher has not seen any return on his investment, financial statements, or received any reports on progress. We believe that Farb Guidance Systems, Inc. received payment for work done from Precision Farming Group, Inc. on the guidance software installed on the equipment leased from Highway Specialties, LLC.

Please consider this letter a formal demand for an accounting of income and expenses for Farb Guidance Systems, Inc. since January 1, 2015, as well as for all paper records for Precision Farming Group, Inc.

These documents were previously requested by the Board of Directors at its recent Board meeting. In addition, as a Director and Shareholder, Karl is entitled to see those records under Idaho and Delaware law. Del. Code Ann. tit. 8, § 220 (2019).

Please provide us with an accounting of income and expenses for Farb Guidance Systems, Inc. since January 1, 2015, as well as all paper records for Precision Farming Group, Inc., by 3 p.m. on April 12, 2019 or Mr. Thatcher will take legal action to obtain an accounting.

Very truly yours,

PETER J. SMITH IV
ATTORNEY AT LAW

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dave Farb
2512 N. Chase Rd.
Liberty Lake, WA 99019

‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖‖

9590 9402 4458 8248 0863 66

2. Article Number *(Transfer from service label)*

7017 3040 0000 7117 2161

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _____    ☐ Agent
                     ☐ Addressee

B. Received by *(Printed Name)*        C. Date of Delivery

DAVID FARB                             4-11-19

D. Is delivery address different from item 1?   ☐ Yes
   If YES, enter delivery address below:         ☐ No

3. Service Type
☑ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053                Domestic Return Receipt



9590 9402 4458 8248 0863 66

**United States Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Smith + Malek
601 E. Front Ave., Suite 304
Coeur d'Alene, ID 83815

**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Dave Farb
2512 N. Chase Rd.
Liberty Lake, WA 99019



9590 9402 4458 8248 0863 59

2. Article Number *(Transfer from service label)*

7017 3040 0000 7117 2178

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature

X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*     C. Date of Delivery

DAVID FARB     4-11-19

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☑ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
(over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053     Domestic Return Receipt



USPS TRACKING#

9590 9402 4458 8248 0863 59

**United States
Postal Service**

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4® in this box•

Smith + Malek
601 E. Front Ave., Suite 304
Coeur d'Alene, ID 83815